# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,      )
                           )    DIVISION ONE
           Respondent,    )
                           )    No. 75872-1-I
          v.              )
                           )    UNPUBLISHED OPINION
JOSEPH JW ROBERTS, JR.    )
                           )
          Appellant.    )    FILED: April 30, 2018
                           )

DWYER, J. — Following a bench trial, Joseph Roberts, Jr. was convicted of domestic violence felony violation of a court order, assault in the third degree domestic violence, tampering with a witness, and five counts of domestic violence misdemeanor violation of a court order. On appeal, Roberts contends that he received ineffective assistance of counsel because his attorney failed to pursue a diminished capacity defense. Roberts also contends that the trial court erred by (1) denying his request for an exceptional sentence downward, (2) failing to vacate his conviction for assault in the third degree, claiming that it merges into his conviction for felony violation of a no-contact order, (3) imposing consecutive sentences on two offenses that constituted the same criminal conduct, and (4) incorrectly calculating his offender score. Roberts also submits a pro se statement of additional grounds.

We remand for correction of certain clerical errors in the judgment and sentence but affirm in all other respects.

I

Joseph Roberts, Jr. and Katrina Wooldridge began a dating relationship sometime in 2013 or 2014. Together they have one child, who was born in April 2015.[1]

In August 2015, following a domestic violence incident, the Bothell Municipal Court issued a pretrial domestic violence no-contact order protecting Wooldridge. In November 2015, Roberts rented a room in a house in Bellevue. Days later, Wooldridge and her son moved in with Roberts in violation of the no-contact order.

On November 19, 2015, Wooldridge called 911. Wooldridge told the emergency operator that Roberts was pointing a BB gun at his own face. Roberts could be heard in the background saying that Wooldridge had hit him and that he was bleeding. Wooldridge told the emergency operator that she could not leave because her son was in the house. Wooldridge then said that Roberts had put down the gun and was throwing her things out of the house while she was putting her son in the car.

Wooldridge began to argue with Roberts while on the telephone with the emergency operator.

| | |
|---|---|
| WOOLDRIDGE: | Why did you just fucking do that? What the fuck? |
| OPERATOR: | Ma'am. |
| WOOLDRIDGE: | Oh my God. |
| OPERATOR: | Hello? |
| WOOLDRIDGE: | Get the fuck away from me and my fuckin' son. He's in the fuckin' car. |

---

[1] Wooldridge was 17 years old when she began dating Roberts, who was 26 years old at the time.

. . .

WOOLDRIDGE:     Get the fuck away from me.

Jonnie Jones, who rented a room in the same house as Roberts, could be heard in the background telling Roberts "Don't touch that girl no god damn more."

Wooldridge asked the emergency operator for help. The call then abruptly ended. The call soon resumed. Wooldridge told the emergency operator that Roberts "just broke a broom over me" and that he "came to me and brought a broom and started hitting my car with my son." Wooldridge said that Roberts had been hitting her with a broom for about 20 minutes and that she had welts all over her body. Wooldridge said that her son was still with her. Roberts left before the police arrived.

Bellevue Police Officer Curtis McIvor responded to the emergency call. Upon arriving at the residence, McIvor noticed that there was a vehicle in the driveway with the door partially open and the light on inside. The vehicle's windshield had been smashed and there were glass particles inside of the vehicle. McIvor also observed that there were various items strewn about the front yard. McIvor went inside the house and spoke with Wooldridge. Wooldridge was sobbing and had a large welt—12 to 15 inches long—on the right side of her shoulder. Wooldridge was too upset to answer any questions.

Wooldridge was treated at the scene by Joshua Holthenrichs, a firefighter medic. Wooldridge told Holthenrichs that she was in a domestic violence dispute and that she was in extreme pain. Wooldridge stated that she was hit with a broom repeatedly, knocked to the ground, kicked in the stomach, and "stomped" on the head. Wooldridge stated that the assault lasted about 20 minutes.

- 3 -

Dr. Marc Bellis treated Wooldridge at the hospital. Wooldridge told Dr. Bellis that she was assaulted by her ex-boyfriend. Wooldridge stated that Roberts kicked her several times in the abdomen and head and hit her with a broomstick. Dr. Bellis reported that Wooldridge was lucid and did not appear to be under the influence of drugs or alcohol.

Wooldridge saw her mother—Lisa Davis—at the hospital that night. Davis testified that Wooldridge was crying and had bruises all over her body. Wooldridge told her mother that Roberts had almost killed her and had been hurting their child. Roberts had sent text messages to Davis earlier that day, stating that he had really hurt Wooldridge and that she was in the hospital. Roberts told Davis that "I could have killed her. You know she is, how she makes me."

Police arrested Roberts the next day. Roberts initially told the arresting officer that he was injured. Roberts changed his mind after the officer offered to take pictures of the injuries. Following his arrest, Roberts began calling Wooldridge from jail.

On December 15, 2015, the King County Superior Court issued a no-contact order protecting Wooldridge based on the current charges against Roberts. Nevertheless, Roberts called Wooldridge from jail at least two times in January in violation of the no-contact order. Roberts called Wooldridge repeatedly from December 1, 2015 through August 5, 2016.[2] Roberts directed

---

[2] The trial court noted that Roberts had called Wooldridge over 800 times while in jail.

Wooldridge to contact the prosecutor's office and the judge and tell them that she had lied about the assault.

At trial, Wooldridge recanted her report of the assault. Wooldridge testified that she was injured after getting in a fight with another person earlier in the day and that her vehicle windshield was broken weeks earlier. Wooldridge testified that she was intoxicated on the day of the assault. Wooldridge testified that she started to argue with Roberts and began trying to pull him out of the house. Wooldridge testified that the only time that Roberts touched her was when he was trying to stop her from pulling him. Wooldridge admitted that she had received telephone calls from Roberts while he was in jail, but testified that it was her idea to pretend to be other women during the calls.

During closing argument, defense counsel argued that Wooldridge had fabricated the entire assault. Defense counsel argued that Wooldridge was mad at Roberts and manufactured her screaming on the 911 call in order to get Roberts in trouble. Defense counsel also argued a theory of self-defense. Defense counsel argued that Wooldridge was the initial aggressor and that, if Roberts did injure Wooldridge, it was because he was defending himself from further harm.

The trial court found Roberts guilty of domestic violence felony violation of a court order, assault in the third degree domestic violence, tampering with a witness, and five counts of domestic violence misdemeanor violation of a court order. The trial court found that the assault occurred within the sight and sound of the parties' minor child. The trial court imposed exceptional sentences on the

felony violation of a court order and assault in the third degree convictions, ordering that those sentences run consecutively. Roberts appeals.

II

Roberts first contends that he received ineffective assistance of counsel. This is so, he asserts, because his attorney failed to present a diminished capacity defense at trial. We disagree.

"Constitutionally ineffective assistance of counsel is established only when the defendant shows that (1) counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance, and (2) there is a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different." State v. Woods, 198 Wn. App. 453, 461, 393 P.3d 886 (2017) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). Failing to satisfy either part of the analysis ends the inquiry. State v. Hendrickson, 129 Wn.2d 61, 78, 917 P.2d 563 (1996). The defendant bears the burden of demonstrating deficient representation and prejudice. In re Det. of Hatfield, 191 Wn. App. 378, 401, 362 P.3d 997 (2015).

"Because the presumption runs in favor of effective representation, the defendant must show in the record the absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel." State v. McFarland, 127 Wn.2d 322, 336, 899 P.2d 1251 (1995). "[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." Hatfield, 191 Wn. App. at 402 (emphasis

added) (quoting State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)). Prejudice is established when there is a reasonable probability that the outcome of the proceedings would have been different had counsel's performance not been deficient. McFarland, 127 Wn.2d at 337.

"Diminished capacity is a mental condition not amounting to insanity which prevents the defendant from possessing the requisite mental state necessary to commit the crime charged." State v. Warden, 133 Wn.2d 559, 564, 947 P.2d 708 (1997). "To maintain a diminished capacity defense, a defendant must produce expert testimony demonstrating that a mental disorder, not amounting to insanity, impaired the defendant's ability to form the culpable mental state to commit the crime charged." State v. Atsbeha, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

Here, Roberts was initially represented by attorney David Montes. Prior to trial, Montes investigated a possible diminished capacity defense. Montes received funding for a clinical psychologist, Dr. Robert Deutsch, to conduct a mental examination of Roberts. Dr. Deutsch conducted an in-person evaluation of Roberts on February 29, 2016 at the King County Correctional Facility.

Roberts told Dr. Deutsch about the night of the assault. Roberts stated that "[e]verything is a blur that night," and that Wooldridge "made me crazy. Wild, literally. I acted as a monster. I wasn't able to control myself." Roberts reported that Wooldridge hit him with the broom first. Roberts reported that he grabbed the broom from Wooldridge and "started poking her with the broom and then it escalates." Roberts continued:

Then I started hitting her. Then overwhelmed. I was lost – in a trance. Angry, scared, I lost time. Time stopped. I felt I needed to keep hitting her. I didn't know how to stop. I went overboard. I couldn't stop. I felt compelled. Like high. Weird. There was no reason for me to go that far. I probably would have killed her. I was that crazed. I've never done that before.

Based on his evaluation, Dr. Deutsch concluded:

On and around November 19, 2015, Joseph Roberts was in a severely regressed psychological state that, per his authentic sounding descriptions, may have reached manic proportions which would have loosened his grip on reality as well as impaired his ability to control his behavior.

In this debilitated mental state, Mr. Roberts' capacity to form the intent for his actions was significantly compromised in that it was based on, and driven by, powerful feelings which were overly influenced by his extensive past experience of subordination.

After receiving Dr. Deutsch's report, Montes withdrew as Roberts' attorney due to an irreparable breakdown in communications. The case was continued for several months and eventually reassigned to attorney Seth Conant.

Defense counsel elected to pursue two distinct defense theories at trial. The first was a general denial defense. Roberts had been contacting Wooldridge from jail and urging her to recant. At trial, Wooldridge testified that she had fabricated the entire assault. Wooldridge testified that her injuries stemmed from a fight earlier that day and that her vehicle's windshield was shattered weeks earlier. Wooldridge testified that she was upset with Roberts and lied in order to get him in trouble. This testimony supported a general denial defense.

Although it was inconsistent with a defense of general denial, defense counsel also pursued a theory of self-defense. Roberts had instructed Wooldridge to testify that he had acted in self-defense. At trial, Wooldridge

testified that she was the initial aggressor. Wooldridge testified that she was intoxicated and that she began trying to pull Roberts out of the house. Wooldridge testified that the only time that Roberts touched her was when he was trying to push her away for his own protection. This testimony supported a theory of self-defense.

Defense counsel considered a third defense—diminished capacity. A theory of diminished capacity was inconsistent with both of the other proffered defenses. First, diminished capacity would have admitted that the assault occurred, contrary to a defense of general denial. Second, a defense of diminished capacity would have relied on Dr. Deutsch's report, which contained statements made by Roberts establishing that he used more force than was reasonably necessary to protect himself from Wooldridge, contrary to theory of self-defense.[3]

Notably, unlike the theories of general denial and self-defense, diminished capacity was not applicable to the charge of assault in the third degree. The mental state required for assault in the third degree, as charged here, was criminal negligence.[4] "Because criminal negligence is based on an objective 'reasonable person' standard, a person may be criminally negligent despite an impairment in mental capacity." State v. Warden, 80 Wn. App. 448, 456, 909

---

[3] The report contained statements by Roberts admitting that he had beaten Wooldridge, that he "felt [he] needed to keep hitting her," and that he "didn't know how to stop."

[4] The State charged Roberts with assault in the third degree by two alternative means: that he, with criminal negligence, caused bodily harm to Wooldridge accompanied by "substantial pain that did extend for a period sufficient to cause considerable suffering," and that he, with criminal negligence, caused bodily harm to Wooldridge "by means of a weapon or other instrument or thing likely to produce bodily harm." RCW 9A.36.031(1)(d), (f).

P.2d 941 (1996), aff'd on other grounds, 133 Wn.2d 559, 947 P.2d 708 (1997). Accordingly, diminished capacity is "not a valid defense to a crime based on criminal negligence." Allstate Ins. Co. v. Raynor, 143 Wn.2d 469, 484, 21 P.3d 707 (2001) (citing State v. Coates, 107 Wn.2d 882, 735 P.2d 64 (1987)).

Defense counsel ultimately decided against presenting a diminished capacity defense.

We can conceive of legitimate tactical reasons why defense counsel decided against pursing a diminished capacity defense. First, it is conceivable that defense counsel made a strategic decision against pursuing a third defense that was inconsistent with both of the other proffered defenses. It is also conceivable that defense counsel, realizing that a diminished capacity defense was not applicable to the charge of assault in the third degree, pursued the only two defense theories that could potentially rebut that charge. Because we can conceive of legitimate tactical reasons why defense counsel elected not to pursue a diminished capacity defense, Roberts fails to overcome the presumption of adequate representation. See Hatfield, 191 Wn. App. at 402 ("[T]he presumption of adequate representation is not overcome if there is any 'conceivable legitimate tactic' that can explain counsel's performance." (emphasis added) (quoting Reichenbach, 153 Wn.2d at 130)).

Nevertheless, Roberts contends that defense counsel should have either pursued all possible defense theories or, alternatively, eschewed the self-defense claim in favor of a diminished capacity defense. This is so, he asserts, because (1) this was a bench trial and the trial judge would have been

accustomed to conflicting defense theories, and (2) a theory of self-defense was implausible given the trial court's posttrial determination that Wooldridge was not a credible witness.

Roberts' contentions are unavailing. Defense counsel must investigate "all reasonable lines of defense." In re Pers. Restraint of Davis, 152 Wn.2d 647, 721, 101 P.3d 1 (2004). "Once counsel reasonably selects a defense, however, 'it is not deficient performance to fail to pursue alternative defenses.'" Davis, 152 Wn.2d at 722 (quoting Rios v. Rocha, 299 F.3d 796, 807 (9th Cir. 2002)). Roberts' attorney investigated and considered three alternative defense theories. In the end, defense counsel elected to pursue two of those theories. Both theories were supported by testimony. "That this strategy ultimately proved unsuccessful is immaterial to an assessment of defense counsel's initial calculus; hindsight has no place in an ineffective assistance analysis." State v. Grier, 171 Wn.2d 17, 43, 246 P.3d 1260 (2011).

Roberts has failed to establish that defense counsel's performance, when considered in light of all the circumstances, fell below an objectively reasonable standard of performance.[5] Accordingly, he has not established ineffective assistance of counsel.

III

Roberts next contends that the trial court erred by denying his request for an exceptional sentence downward. This is so, he asserts, because Dr.

---

[5] Because Roberts has failed to establish the first prong of the Strickland analysis, 466 U.S. at 687, we need not consider whether he was prejudiced by his counsel's performance. Hendrickson, 129 Wn.2d at 78.

Deutsch's report established that his capacity to appreciate the wrongfulness of his conduct was significantly impaired. We disagree.

A sentence within the standard sentence range is generally not appealable. State v. Mail, 121 Wn.2d 707, 710, 854 P.2d 1042 (1993); RCW 9.94A.585(1). "[W]hile trial judges have considerable discretion under the [Sentencing Reform Act of 1981 (SRA)], they are still required to act within its strictures and principles of due process of law." State v. Grayson, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) (citing Mail, 121 Wn.2d at 712). A trial court abuses its discretion when it "refuses categorically to impose an exceptional sentence below the standard range under any circumstances." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). Likewise, "[t]he failure to consider an exceptional sentence is reversible error." Grayson, 154 Wn.2d at 342.

Here, Roberts requested an exceptional sentence downward pursuant to the impaired mental capacity statutory mitigating factor. That mitigating factor requires the defendant to establish, by a preponderance of the evidence, that the "defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired." RCW 9.94A.535(1)(e). Roberts relied on Dr. Deutsch's report to establish this mitigating factor.

The trial court considered the proffered mitigating factor, recognized that the court possessed the authority to impose an exceptional sentence downward,

and concluded that Roberts had failed to establish the mitigating factor by a preponderance of the evidence.

> As far as the exceptional down, you know, it's the Defendant's obligation to establish that there is a mental defect or a mental condition such that Defendant couldn't appreciate the wrongfulness of his conduct. I read the report from the psychologist, and it's heartbreaking what Mr. Roberts went through as a child. There's no – no doubt about it, and it would make anybody angry. You know, he has anxiety. He has depression. He has all these – all these things, but that doesn't mean that when he was beating her with the broomstick that he didn't know – he couldn't appreciate that that was wrong. There is no basis for an exception down here.

"[A] trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion, and the defendant may not appeal that ruling." Garcia-Martinez, 88 Wn. App. at 330. Roberts has failed to establish a basis for appellate relief.

IV

Roberts next contends that his conviction for assault in the third degree must be dismissed because it merges into his conviction for felony violation of a court order. He is wrong.

We review de novo questions of double jeopardy. State v. Leming, 133 Wn. App. 875, 881, 138 P.3d 1095 (2006). The double jeopardy clauses of the federal and state constitutions "protect against multiple punishments for the same offense." In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004); U.S. CONST. amend V; WASH. CONST. art. I, § 9. "If the legislature authorizes cumulative punishments for both offenses, double jeopardy is not offended." State v. Moreno, 132 Wn. App. 663, 667, 132 P.3d 1137 (2006).

"Where a defendant's act supports charges under two criminal statutes, a court weighing a double jeopardy challenge must determine whether, in light of legislative intent, the charged crimes constitute the same offense." Orange, 152 Wn.2d at 815.

The violation of a no-contact order is generally a gross misdemeanor but may be elevated to a felony if the violation involves "[a]ny assault that is a violation of an order issued under this chapter . . . and that does not amount to assault in the first or second degree" or "any conduct in violation of such an order that is reckless and creates a substantial risk of death or serious physical injury to another person." RCW 26.50.110(4). As pertinent here, a defendant is guilty of assault in the third degree if he or she, under circumstances not amounting to assault in the first or second degree, "[w]ith criminal negligence, causes bodily harm to another person by means of a weapon or other instrument or thing likely to produce bodily harm"; or, "[w]ith criminal negligence, causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering." RCW 9A.36.031(1)(d), (f). Felony violation of a no-contact order carries a greater seriousness level than does assault in the third degree. Moreno, 132 Wn. App. at 671.

We have previously considered this issue and held that imposing punishment for both assault in the third degree and felony violation of a no-contact order based on the same assault does not violate double jeopardy. Moreno, 132 Wn. App. at 667-71 ("[T]he legislature clearly intended that the crimes of felony violation of a court order and third degree assault should be

- 14 -

considered separate crimes and punished separately."); see also Leming, 133 Wn. App. at 883-87. There was no double jeopardy violation.[6]

## V

Roberts next contends that the trial court erred by ordering that his convictions for assault in the third degree and felony violation of a court order be served consecutively. Roberts asserts that, because the two crimes constitute the same criminal conduct, the sentences are statutorily required to be served concurrently. Again, he is wrong.

The SRA provides, in pertinent part:

Except as provided in (b), (c), or (d) of this subsection, whenever a person is to be sentenced for two or more current offenses, the sentence range for each current offense shall be determined by using all other current and prior convictions as if they were prior convictions for the purpose of the offender score: PROVIDED, That if the court enters a finding that some or all of the current offenses encompass the same criminal conduct then those current offenses shall be counted as one crime. Sentences imposed under this subsection shall be served concurrently. Consecutive sentences may only be imposed under the exceptional sentence provisions of RCW 9.94A.535. "Same criminal conduct," as used in this subsection, means two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim.

RCW 9.94A.589(1)(a).

---

[6] Roberts contends that our conclusion in Moreno, 132 Wn. App. at 667-71, is contrary to the merger doctrine, which he asserts is an independent standard that must be analyzed separately from legislative intent. He is wrong. The merger doctrine is simply one tool that courts may use to discern legislative intent. See, e.g., State v. Freeman, 153 Wn.2d 765, 771-73, 108 P.3d 753 (2005) ("Third, if applicable, the merger doctrine is *another aid in determining legislative intent,* even when two crimes have formally different elements." (emphasis added)). Having already discerned the legislative intent with regard to these crimes, we need not employ the merger doctrine.

The SRA further provides that "[a] departure from the standards in RCW 9.94A.589 (1) and (2) governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in this section." RCW 9.94A.535. As pertinent here, a trial court may impose an exceptional sentence if it finds beyond a reasonable doubt that the "offense involved domestic violence" and that "[t]he offense occurred within sight or sound of the victim's or the offender's minor children under the age of eighteen years." RCW 9.94A.535(3)(h)(ii); RCW 9.94A.537(3).

Here, the trial court found that the offenses of assault in the third degree and felony violation of a court order constituted the same criminal conduct. The trial court counted those convictions as one crime for purposes of calculating the offender score. However, the trial court also concluded that an exceptional sentence was warranted because the offense involved domestic violence that occurred within the sight or sound of the parties' minor child. RCW 9.94A.535(3)(h)(ii). Accordingly, the trial court imposed a sentence within the standard range for each conviction and ordered that those sentences run consecutively.

RCW 9.94A.589(1)(a) does not prohibit the imposition of consecutive sentences as an exceptional sentence. Although the first part of the statute states that sentences for multiple offenses constituting the same criminal conduct shall run concurrently, the second part of the statute explicitly permits consecutive sentences "imposed under the exceptional sentence provisions of RCW 9.94A.535." RCW 9.94A.589(1)(a). RCW 9.94A.535 provides that "[a]

departure from the standards in RCW 9.94A.589 (1) and (2) governing whether sentences are to be served consecutively or concurrently is an exceptional sentence subject to the limitations in this section." Read together, the plain language of RCW 9.94A.589(1)(a) and RCW 9.94A.535 authorize the imposition of consecutive sentences when an exceptional sentence is warranted, even when the offenses constitute the same criminal conduct.

Division Three of this court has previously reached the same conclusion:

> Whatever confusion may result from the first part of this section, the final sentence is permissive language referring to the imposition of consecutive sentences . . . . RCW 9.94A.120 addresses the bases for departing from the standard range and [RCW 9.94A.535] lists mitigating and aggravating factors for the imposition of exceptional sentences. The Supreme Court upheld the aggravating factors of deliberate cruelty and multiple injuries as applied to both offenses. Because RCW 9.94A.390(2)(a) specifically mentions deliberate cruelty as an aggravating factor, it follows that the sentencing court correctly exercised its discretion when ordering the consecutive sentences . . . .
>
> . . . .
> Despite a determination that offenses comprise the "same criminal conduct," where the sentencing court finds aggravating factors that apply to multiple offenses, the SRA permits the imposition of more than one exceptional sentence and consecutive sentences.

State v. Worl, 91 Wn. App. 88, 95, 955 P.2d 814 (1998) (citing State v. Smith, 123 Wn.2d 51, 57-58, 864 P.2d 1371 (1993)); see also State v. Garnica, 105 Wn. App. 762, 768-69, 20 P.3d 1069 (2001) ("[T]he court determined the rapes encompassed the same criminal conduct . . . [b]ut a trial court can sentence

consecutively under RCW 9.94A.400(1)[7] provided aggravating factors justify imposition of an exceptional sentence." (citing Worl, 91 Wn. App. at 94-95)).

There was no error.[8]

## VI

Roberts submits pro se statements of additional grounds pursuant to RAP 10.10. None of them warrant appellate relief.

Roberts first contends that he received ineffective assistance of counsel because his counsel failed to pursue a diminished capacity defense. As discussed herein, we disagree.

Roberts also contends that there was insufficient evidence to support the trial court's finding that the assault occurred within the sight and sound of the parties' minor child. Roberts asserts that Jones and Wooldridge both testified that the child was inside the vehicle during the assault and that the assault occurred inside the house.

In determining the sufficiency of the evidence, "[t]he standard of review is whether, after viewing the evidence in a light most favorable to the State, any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." State v. Rempel, 114 Wn.2d 77, 82, 785 P.2d 1134 (1990). "A claim of insufficiency admits the truth of the State's evidence and all

---

[7] RCW 9.94A.400(1)(a) was later recodified as RCW 9.94A.589(1)(a) with substantially the same language.

[8] Roberts contends that this result is contrary to our Supreme Court's decisions in State v. Tili, 139 Wn.2d 107, 985 P.2d 365 (1999) (Tili I) and State v. Tili, 148 Wn.2d 350, 357, 60 P.3d 1192 (2003) (Tili II). We disagree. Neither Tili I nor Tili II held that consecutive sentences may not be imposed as an exceptional sentence when the offenses constitute the same criminal conduct. Rather, the court indicated the opposite, stating that Tili's "'sentence . . . [was] statutorily required to be served concurrently *unless an exceptional sentence* [*was*] *imposed.*'" Tili II, 148 Wn.2d at 366 (alterations in original) (quoting Tili I, 139 Wn.2d at 110).

reasonable inferences drawn therefrom." State v. Fleming, 155 Wn. App. 489, 506, 228 P.3d 804 (2010).

As discussed herein, Wooldridge told the emergency operator that she could not leave the house because her infant son was with her. Wooldridge told the emergency operator that Roberts was throwing her things out of the house as she was trying to put her son in the vehicle. Wooldridge could be heard telling Roberts to "[g]et the fuck away from me and my fuckin' son. He's in the fuckin' car." After Wooldridge told the emergency operator that Roberts had beaten her with a broom, she stated that her son was still with her. Wooldridge told the emergency operator that Roberts had smashed her vehicle's windshield while her son was still inside the vehicle. Wooldridge stated that Roberts had almost killed her and that he had hurt their son. This evidence is sufficient to support the trial court's finding.

Roberts has failed to establish a basis for appellate relief.

VII

Finally, the State concedes that this matter should be remanded for correction of certain clerical errors in the judgment and sentence.

As discussed herein, the trial court found that the assault in the third degree and felony violation of a court order offenses constituted the same criminal conduct. The trial court found that the appropriate offender score for those convictions was six. The trial court corrected the standard range sentences on the amended judgment and sentence, but failed to change the offender score to six for these convictions. The trial court also changed the

standard range sentence for the witness tampering conviction to reflect an offender score of one, but did not amend the offender score itself.

We remand for correction of these clerical errors. We affirm in all other respects.

We concur:

_Dwyer, J._

_Mann, A.C.J._      _Leach, J._